# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Milton I. Shadur | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 874 | **DATE** | 6/25/2001 |
| **CASE TITLE** | In Re: Comdisco Securities Litigation | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons stated, (1) Peter Moser is designated as the most adequate plaintiff to represent the previously-defined class in this action and (2) Moser's own counsel, the law firm of Wolf Haldenstein Adler Freeman & Herz LLC, is approved as class counsel. In further implementation of these rulings, Case No. 01 C 874 is dismissed without prejudice, with the Amended Complaint in that case being treated as having been filed under this Case No., and the Amended Complaint is further amended by deleting all name plaintiffs other than Peter Moser as class representatives and by deleting the names of all plaintiffs' counsel other than the Wolf firm. All other motions for appointment as lead plaintiff are denied. (0-1, 27-1, 28-1) in 01C2110 and (17-1, 19-1) in 01 C 974. A status is set for 7/17/01 @ 9.

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| | Copy to judge/magistrate judge. | |

number of notices

JUN 2 7 2001
date docketed

*eav*
docketing deputy initials

6/26/2001
date mailed notice

SN

courtroom deputy's initials

FILED FOR DOCKETING
01 JUN 26 PM 1: 45

Date/time received in central Clerk's Office

SN6
mailing deputy initials

**Document Number**

25

In re                              )
                                   )    No. 01 C 2110
    COMDISCO SECURITIES LITIGATION )    (also entered in
                                   )    Case No. 01 C 874)
                                   )

## MEMORANDUM OPINION AND ORDER[1]

This Court's Opinion 1 (copy attached) explained the

predicate, in conjunction with the necessary determination under

15 U.S.C. §78u-4(a)(3)(B)[2] of the "most adequate plaintiff" to

represent the class in this putative securities class action, for

considering the possibility of inviting sealed competitive bids

from counsel who seek to act as class counsel (a subject

previously addressed by this Court in two earlier actions, one

involving antitrust claims (see In re Amino Acid Lysine Antitrust

Litig., 918 F.Supp. 1190 (N.D. Ill. 1996)) and the other being

---

[1]  As this opinion reflects, a full understanding of its
treatment of the issues dealt with here calls for familiarity with
three earlier opinions issued in this action.  Because two of
those opinions have not been published, while this one will be,
copies of those unpublished opinions of March 26 ("Opinion 1") and
April 6, 2001 ("Opinion 2") are being attached.  As for the third
of those opinions ("Opinion 3," issued April 10, 2001), it is now
awaiting publication and will of course be in print before this
one.  Accordingly it is not being attached here but will instead
be referred to in terms of its Westlaw case number 2001 WL 421918
(for some unknown reason, the internal page references are shown
by Westlaw as "not available"), which will be supplanted by its
F.Supp.2d citation when this opinion also reaches the print stage.

[2]  As before, each future reference to any subpart of 15
U.S.C. §78u-4 will omit that portion of the statutory designation,
reading simply "Subsection --."

another private securities class action (see <u>In re Bank One</u>

<u>Shareholders Class Actions</u>, 96 F.Supp.2d 780 (N.D. Ill. 2000).

Shortly thereafter Opinion 2 (copy also attached) invited such

bids.

With the competitive bids for legal representation now in

hand, as well as a further submission having been received from

counsel for Peter Moser ("Moser") (discussed hereafter) that

relates directly to the "most adequate plaintiff" issue, this

Court is now in a position to act on both of those related

subjects. This opinion will first deal with the identification of

the most adequate plaintiff (alternatively referred to, as the

statute does, as "lead plaintiff") and then with the subject of

approving class counsel.

Opinion 3 began by stating this tentative view as to the

identity of the presumptive lead plaintiff:

> Based on the movants' respective representations, it
> would appear that the Commonwealth of Pennsylvania
> State Employees' Retirement Systems ("PASERS," treated
> as a singular noun here) is the presumptive lead
> plaintiff by a wide margin: Its Ex. B Sch. A to its
> supporting Memorandum of Law shows that it purchased
> about 250,000 shares of Comdisco, Inc. common stock
> during the proposed Class Period described in the
> Complaint and that it claims losses of some $2.4
> million.

But a later submission on behalf of Moser, who has also sought

appointment as lead plaintiff, has once again demonstrated the

wisdom of Phaedrus' two-millenium-old aphorism that "Things are

not always what they seem."  It turns out that when the Class Period of January 25 through October 3, 2000 (which is the proper referent) is focused upon, PASERS' claim that it suffered some $2.4 million in losses in connection with its investment in Comdisco common stock is only a mirage created by PASERS' adoption of a FIFO (first-in-first-out) approach to its dealings in the stock.  In fact PASERS was an active trader during the Class Period, with 15 separate sales that more than matched its purchases during that time frame:  Its Class Period purchases of Comdisco common stock aggregated 213,800 shares, while its sales during the same period totaled 218,400 shares.  And when those transactions are properly matched, rather than by the impermissible application of a FIFO methodology (which by definition brings into play PASERS' pre-Class-Period holdings as the purported measure of its claimed loss), PASERS' Class Period sales at inflated prices[3] caused it to derive unwitting benefits rather than true losses from the alleged securities fraud--so much so that Moser demonstrates that PACERS derived a net gain of almost $300,000 (rather than any net loss at all) from its purchases and sales during the Class Period.

There are a host of cases, exemplified by In re Olsten Corp.

---

[3]  This discussion presumes, as it must for present purposes, the accuracy of the Complaint's allegations that Comdisco's stock was being traded at inflated prices until the stock fell out of bed because of a public disclosure at the end of the Class Period.

Sec. Litig., 3 F.Supp.2d 286, 295 (E.D. N.Y. 1998), that reject

the kind of artificial "loss" that is manufactured by PASERS'

attempted FIFO construct in favor of a calculation that properly

nets out purchases and sales during the class period and

determines gains or losses in those terms.  That is all of a piece

with the concept of "actual damages" recovery that is uniformly

embraced by such cases as Astor Chauffeured Limousine Co. v.

Runnfeldt Inv. Corp., 910 F.2d 1540, 1551-52 (7th Cir. 1990).

Hence PASERS, despite (or in a sense because of) its large-volume

trading in Comdisco stock during the Class Period, is totally out

of the running for designation as lead plaintiff.[4]

Among the other candidates that have sought appointment as

lead plaintiff, Moser himself is the leader (in the relevant sense

of out-of-pocket loss) by a substantial margin.  Application of

the appropriate Olsten approach to his transactions during the

Class Period (transactions that also included both ins and outs)

---

[4]  Moser's submission also points out that PASERS' counsel
had written this Court on April 9, 2001 that their client was
unwilling to serve as lead plaintiff unless this Court were to
approve the appointment of that counsel to represent the class.
That position was then essentially reaffirmed by PASERS' in-house
general counsel, and PASERS' outside counsel has not chosen to
participate in the bidding procedure at all.  Moser's counsel
therefore suggests that PASERS may have withdrawn from
consideration as lead plaintiff--but that question need not be
explored, because PASERS is knocked out of the box on the merits
in any event.

discloses that he sustained a net loss of over $140,000.[5]
Accordingly the answer to the first question posed by the
statutory structure is that Moser is presumptively the "most
adequate plaintiff."

To turn then to the related subject of class counsel, whom
Subsection (a)(3)(B)(v) specifies is to be selected and retained
by the most adequate plaintiff "subject to the approval of the
court," it is unfortunate that the quantity of bids received from
well-qualified and experienced class counsel this time around has
been meaningfully smaller than this Court has previously obtained
in the <u>Amino Acid Lysine</u> and <u>Bank One</u> actions and that this Court
knows, from its active ongoing monitoring of other opinions
dealing with the subject, to be typical of other major class
actions. Although it is not possible to be precise as to why that

---

[5] Another application for appointment as lead plaintiffs has
come from Joseph Lyng and Gregory Davidovich, who report losses
during the Class Period that aggregate just under $143,000--just a
tad more than Moser's individually-sustained loss. Although
Subsection 4(a)(3)(B)(i) does permit the appointment of a group as
well as a single class member as the "most adequate plaintiff,"
the caselaw has generally disapproved aggregation just for the
sake of aggregation. In this instance nothing is said in their
joint application to link Messrs. Lyng and Davidovich, other than
the obvious fact that each of them was a purchaser of Comdisco
shares. But so was Moser, and he individually suffered
substantially more harm than either of them. That, coupled with
the added factor that the Lyng-Davidovich counsel have not chosen
to participate in the bidding process, further confirms the
appropriateness of designating Moser as the class representative.

should be so,[6] it seems very likely that one major factor in this
case is Comdisco's continuing financial decline:  Last week's
financial sections carried a story that its credit rating has been
downgraded by Moody's Investors Service for the third time in
three months, signaling a strong likelihood that it may soon face
a default situation--and unsurprisingly, Comdisco's common stock
has spiraled downward to the point where its current market
quotations are in the range of $1 per share.  Surely the prospect
of taking on the handling of a major class action that may end
up--even if "successful"--as the equivalent of tapping an empty
barrel holds out less attractiveness for experienced law firms
that can better spend their time on other matters that hold out
greater promise of being productive financially for other
plaintiff classes and for the law firms themselves.

There is however an added factor that has emerged here as the

---

   [6]  In a different context, speaking of the difficulty of
quantifying damages that stem from trademark or service mark
infringement, this Court once said (Instrumentalist Co. v. Marine
Corps League, 509 F.Supp. 323, 333 (N.D. Ill. 1981)):

   [T]here is no effective way to measure the loss of
   sales or potential growth--to ascertain the people who
   don't knock on the door or to identify the specific
   persons who do not reorder because of the existence of
   the infringer.

That truism, later quoted by our Court of Appeals in a similar
case (Hyatt Corp. v. Hyatt Legal Servs., 736 F.2d 1153, 1158 (7th
Cir. 1984)), appears equally applicable to the present difficulty
of determining the number and identity of any law firms that may
have been or were in fact deterred from bidding by the adverse
factors next described in the text.

unfortunate fallout of a portion of the Third Circuit's recent In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 742-43 (3d Cir. 2001) opinion. One of the substantial active players in the plaintiffs' class action bar--a firm with fine credentials and experience that has handled other major class actions and that has been a responsible bidder in other cases before both this Court and other courts--has written this Court that it would not bid here because it perceived Cendant PRIDES as having placed bidders in a no-win situation, in which if they prove successful in becoming lead counsel the terms of their successful bids would set a ceiling on fees, while on the downside they would be subject to ex post second guessing by the court's utilization of a lodestar comparison as a benchmark.

It need scarcely be emphasized that this Court is in total accord with the basic teaching of the Third Circuit in Cendant PRIDES and other cases that the determination of a reasonable fee in the class action context must ultimately be for the court (in the field of private securities actions, see Subsection (a)(6)). Nor does this Court part company with the bulk of the thoughtful discussion and analysis in Cendant PRIDES on the subject of lawyers' fees that may properly be awarded in the private securities class action context (including the valuable compilation of federal court fee awards during the last 15 years set out at 243 F.3d at 737-38, a table that undercuts severely the

all-too-prevalent notion that the "normal" range of such awards is in the area of 25% to 35% of the class recovery).[7]  Instead the problem identified by the nonbidding law firm in this action, and a concern shared by this Court, lies in the added notion that the lodestar figure and its possible multiplier should regularly play a major role in cross-checking the result that is arrived at by applying the successful competitive bid formulation to the recovery ultimately obtained by the successful bidder.

It is worth repeating a bit of what this Court has said in other forums (including invited testimony before the Third Circuit's recently-created Task Force studying the subject) in addressing this issue.[8]  Think of the posture of a law firm that is contemplating taking on a major piece of class action litigation (necessarily on a contingency basis), just as law firms sometimes take on the handling of major commercial litigation for

---

[7]  It is true that Cendant PRIDES limited its compilation to class actions in which the recovery exceeded $100 million.  But this Court's prior experience as well as the bidding results in the present case confirm that the cited mythic norm is grossly excessive even where substantially smaller amounts are at stake.

[8]  It should however be emphasized that what has been said here, and what is said hereafter, does not fairly apply with equal force to the typical consumer class action (with its most likely small per-class-member award), and also that any attempt to utilize class actions in the field of mass torts also brings other factors into play.  In this Court's view it is a mistake to adopt any Gertrude Stein type of one-size-fits-all stance in approaching the subject of awarding lawyers' class representation or of awarding their fees for such services, as though:

Class action is a class action is a class action.

individual clients that are unable to pay for services on a pay-as-you-go basis and must therefore enter into a contingency arrangement with counsel. If in either such situation the skilled and experienced lawyer knows that he or she is competing against others who are likewise skilled and experienced, that lawyer perforce bases his or her proposal on the best possible informed evaluation of the potential risks and rewards of handling the case as known at the outset--an evaluation that deals with the uncertainties of recovery or nonrecovery, as well as with an estimated up-front quantification of the potential recovery if successful. That is the true essence of the free market of properly structured competitive bidding.

Fast forward, then, to the time when the same litigation has reached a successful outcome, whether via settlement (the most frequent fate of the "successful" securities or other commercial class action) or by traveling the entire litigation path through trial--and perhaps on appeal as well.[9] If counsel has obtained that desired favorable result for the class clients with the expenditure of (say) two-thirds of the number of hours that counsel had initially anticipated in formulating the original bid,

---

[9] Only the handling of a successful case needs to be discussed, for the unsuccessful class action or contingent private action moots the topic of fees for plaintiffs' counsel. But it should not be forgotten that at the going-in stage any sensible lawyer will have pegged his or her proposal high enough to take into account the possibility of ending up with no recovery for the client or client class, and hence with no fee.

it seems entirely unfair to penalize that successful counsel for having done so--that is, to measure the reasonableness of a bid-generated percentage-of-recovery fee against a lodestar benchmark that has been calculated in hindsight in terms of those actually expended hours. After all, if the litigation had instead taken the path under which counsel had to slug the matter out to get that same result, spending (say) 150% or 200% of the originally anticipated hours, counsel would not be allowed to restructure its percentage bid in comparable hindsight terms to get a bigger share of the recovery. Nor is the problem truly alleviated by the possibility of applying a multiplier to the raw lodestar figure, because that does nothing more than to introduce a purely arbitrary factor (untested by market principles) into the mix as a sort of rationalization to support the announced conclusion.[10]

---

[10] It is worth spending a few moments on the subject of lodestar multipliers, which to this Court seem most often to represent an effort to provide some non-existent garb for the proverbial emperor who has no clothes. To be sure, when a fee award is enormously disproportionate to the lawyers' expenditure of time (as this Court understands to be the case in the larger branch of the Cendant litigation, which has not yet been addressed on appeal by the Third Circuit), it may be useful for a court to express the disapproval of that disparity in terms of pointing to a correspondingly staggering lodestar multiplier--a sort of Jacobellis v. Ohio ("I know it when I see it") demonstration. But when the issue comes down to whether a multiplier of 2 or 5 or 7 (or what have you) is or is not "reasonable," so as to serve as some sort of check on the reasonableness of a percentage-of-recovery fee award, candor compels recognition of the fact that the process has become wholly subjective rather than meeting the objective goal implicit in the notion of reasonableness (what standard, after all, determines the reasonableness of the numeric multiplier?). Unfortunately, any ruling that a multiplier (say)

Again to view the matter through the lens of free market
principles, any such ex post reevaluation (with or without a
multiplier) is truly unjustified as a matter of logical
analysis--and certainly so if it is only a one-way street.[11]

This Court is of course well aware of the view held by some
judges that bidding is inappropriate in the securities class
action context (see, e.g., In re Razorfish, Inc. Sec. Litig., No.
00 CV 9474JSR, 2001 WL 476504, at *5 (S.D. N.Y. May 4)), or even
more broadly that bidding is not a proper procedure to be employed
in the selection of counsel in any class action situation.  As to
the former view, it ignores the fact that Congress has
specifically provided that the selection of class counsel by the
"most adequate plaintiff" is made "subject to the approval of the
court" (Subsection (a)(3)(v)).  That requirement of court approval
is expressly served by the court's taking into account the fee
arrangement that the proposed class counsel wishes to impose on
all other class members as part of the same court's determination

---

of 2.5 is reasonable, while a multiplier (say) of 3.5 or 4 is not,
too often makes it possible to paper over a result-driven
conclusion with a purported semblance of precision.

[11] Once again, this conclusion is quite apart from the added
prospect that the referenced portion of the Cendant PRIDES opinion
may be read by prospective bidders as signaling a message that
seriously discourages their willingness to participate in the
bidding competition.  No plaintiff class is better served by any
factor that tends to chill healthy competition for its
representation--competition that if left unchilled is quite likely
to produce a better deal for the class.

whether the <u>presumptive</u> "most adequate plaintiff" is <u>in fact</u> the most adequate. Are we judges merely to serve instead as rubber stamps, thus failing to enforce the fiduciary responsibilities owed by the lead plaintiff <u>and</u> by the lead plaintiff's counsel to the class? On that score this Court has already made the point plain in <u>Bank One</u>, 96 F.Supp.2d at 784 and has again quoted that <u>Bank One</u> language in Opinion 3, and it need not be repeated once again here.

In that regard, when the lead plaintiff has negotiated a fee arrangement with its counsel (if "negotiated" is indeed the right term), what does the court know as to the means if any by which the client has sought to make an informed judgment as to the market for legal services? This Court has yet to see an opinion that reflects a serious judicial exploration of what a putative lead plaintiff has done to assure itself that the economics of the fee arrangement that it has agreed upon with its counsel are the best that can be obtained from first-rate lawyers with high-quality credentials and significant experience in the successful prosecution of class actions.

Indeed, if a court were to contemplate essaying such an inquiry into the efforts made by a party that was hopeful of designation as lead plaintiff, what could it anticipate finding? It is hardly reasonable to expect any plaintiff, on the speculative prospect of acting for a class, to engage on his, her

or its own in the kind of comprehensive and studied beauty contest required to search out a cadre of law firms ready, willing and able to act as class counsel and to ascertain which of those firms is prepared to do so on the terms most favorable to the entire class. Yet fundamental economic analysis teaches that to be the only way in which there is any real assurance of maximizing the class' ultimate welfare. And to that end a neutrally conducted and confidential competitive bidding process under the auspices of the court affords the best means--in fact, it would seem the only means--to derive that necessary information, so that the class gets the best available combination of highly competent representation at the least cost.

Instead, those who would seek to denigrate or even forbid the use of competitive bidding for class representation place their reliance on whatever arrangements for legal representation have been made by the private discussions between the class representative and its preferred counsel (subject to a post-hoc judicial determination whether those arrangements have produced a reasonable fee, a subject that has been and is hereafter discussed at greater length elsewhere in this opinion). If the client has made less than the best possible deal for itself, so be it--it pays its own way, and that too is in the best free market tradition. But to impose the individual client's bargain (or lack of bargain) on all other class members--those to whom every lead

plaintiff owes fiduciary responsibilities and for whom the court must act as surrogate--is extraordinarily problematic.

Lest this view be perceived as purely theoretical (if not indeed heretical), we need look no farther than this month's _In re Rite Aid Corp. Sec. Litig._, Nos. MDL 1360, 99-CV-1349 CIV.A. 99-2493, 2001 WL 632941 (E.D. Pa. June 8) opinion by District Judge Stuart Dalzell. There the approved settlement generated a present value of $177 million for the class, and it is certainly appropriate to accept Judge Dalzell's evaluation of the settlement as highly favorable and his characterization of the class counsel's services there as having produced outstanding results (_id_. at *21). But what calls for sharper scrutiny for present purposes is Judge Dalzell's description of the affidavit by Professor John Coffee that was submitted by class counsel in support of the requested fee award (_id_. at *22):

> At Table 5 of Professor Coffee's affidavit, ¶21 at 14, he compiles 289 settlements ranging from under $1 million to $50 million. The average attorney's fees percentage is shown as 31.71%, and the median turns out to be one-third. This Table alone demonstrates the reasonableness of the 25% sought here.
>
> We are fortified in this conclusion by Professor Coffee's survey of "mega" class action settlements over the last decade, set forth in ¶29 of his Declaration. While it is true that two $1 billion settlements awarded fee percentages of 15% and 14%, respectively, settlements of $52 million and over ranged in fee percentages from 18% to as high as 37%. The average percentage of settlements between $100 million and $200 million is 28.1%. _Id_.

14

The 25% is, therefore, eminently reasonable, and we therefore approve it.

It is not of course for this Court to pass judgment on a case not before it. But it is surely startling to observe that in the two cases in which this Court has employed the bidding process, each of which generated a settlement in the $50 million range worked out by extremely able and experienced plaintiffs' class action counsel, the bid-generated fee award came to only 6% of the recovery. And what that meant in each case was that the plaintiff class members ended up with fully $10 million or more in their pockets than if this Court had followed the primrose path marked out by the average or median cases addressed in the Coffee affidavit.[12] And as will be seen, that same comparison--one that is highly unfavorable to the gestalt approach that unfortunately marks the mine run of such litigation--favors the use of bidding even in the less active bidding climate that has emerged in this case for reasons unique to it.

---

[12] There is yet another benefit to the use of a bidding procedure, one that plays a significant role in the type of disparity in fee awards just remarked in the text. By definition, the award to a single bidder that is then responsible for performing and monitoring all of the work (enlisting any assistance that the bidder finds necessary) eliminates the phenomenon that this Court has sometimes described as multiple lawyers feeding at the trough (labeled as lead counsel, liaison counsel, plaintiffs' steering committee and what have you--see sample case-management order 41.30 in the Manual for Complex Litigation (3d ed. 1995)), a situation that inevitably ups the ante in terms of the total fee applications tendered to the court for approval.

15

Both the caselaw and treatises that speak of such a "norm" have regrettably perpetuated a pattern that short-changes the plaintiff classes. It may perhaps be that at some future point the increased use of bidding for legal representation will itself have generated enough evidence of the propriety of a new set of "norms" at much lower percentages, so that some further examination of the continued utility of the bidding process may then be called for. But unless and until that were to occur, this Court remains of the opinion that to be faithful to the duty owed by courts to their constituencies--all of the members of plaintiff classes--our federal courts should continue to structure and to call for counsel's compliance with soundly conceived bidding procedures.

This is not to say, of course, that a look at the scope and extent of the services expended by counsel to obtain their successful results should not be a factor in the courts' discharge of their own duty, at the end of the day, to impose a reasonableness requirement on any proposed awards that are subject to judicial approval. Perhaps the best way to summarize the matter is to say that any fee that has been calculated as the product of an initially adopted well-conceived competitive bidding procedure should carry with it a strong presumption of reasonableness, just as the result of any true free market bargain of any kind is presumptively reasonable.

It is thus somewhat of an understatement to say that this Court's reexamination of the propriety of the use of bidding to award legal representation in securities class actions has confirmed a strongly affirmative answer to that question for the case now at issue. To turn then to how that plays out in this action, this opinion has already said that the bidding proved to be much more sparse here than in other situations with which this Court has dealt, or that it has seen described in other reported opinions.[13] Although only three firms submitted bids in this case, the credentials and experience of those firms themselves, as well as the nature of their bids, demonstrates that the necessary high quality--far more important than quantity--is amply present.

To begin with Moser's own firm, Wolf Haldenstein Adler Freeman & Herz LLC (the "Wolf Firm"), it has submitted an across-the-board 7.5% of the class recovery as its proposed bid. It has coupled that proposal with a ballpark estimate of $150 million in potential damages in the litigation as a whole. Even apart from the obvious fact that Comdisco's ensuing dramatic continuation of its financial difficulties--a downward spiral, as already mentioned--may well pose problems that could render any earlier

---

[13] As anyone familiar with the subject knows, the most active judicial user of the bidding procedure has been Honorable Vaughn Walker of the United States District Court for the Northern District of California. Judge Walker not only pioneered the approach, but his calendar appears to have continued to present the most frequent opportunities for its application.

estimate suspect, everyone with experience in the field recognizes that the estimate of potential damages is not often realized--a subject addressed a bit later. In the meantime, it should be added that the credentials of the Wolf Firm, well evidenced by its written proposal and by the accompanying CV information, are impeccable.

Another bidder, Wechsler Harwood Halebian & Feffer LLP (the "Wechsler Firm"), has just completed yeoman service as the successful bidder and hence the class counsel in the <u>Bank One</u> litigation, producing a highly favorable settlement that this Court has already approved in its extensive June 1, 2001 oral ruling as fair, reasonable and adequate--the conventional skeletal formulation that really does not do full justice to both the result and the quality of the Wechsler Firm's services. That firm's credentials have already been evaluated and described in this Court's earlier opinions in <u>Bank One</u>, and within a matter of days this Court will be issuing a supplemental opinion dealing with the subject of the approved fee award in that case. Just as it did in <u>Bank One</u>, for purposes of this case the Wechsler Firm coupled a percentage-of-recovery formula with a voluntarily-established cap on its fees: 20% of the first $4 million, 15% of the next $8 million and 10% of the next $13 million, with the cap of $3.3 million coming in to play on any recovery in excess of $25 million. In terms of the "crossover point" between the Wolf Firm

and Wechsler Firm bid formulations (see <u>Bank One</u>, 96 F.Supp.2d at 786 n.7), this litigation would have to generate a recovery of more than $44 million before the class could fare better financially under the Wechsler Firm's bid than under the Wolf Firm's across-the-board proposal.

Finally, the third bidder is another experienced firm with first-rate credentials as evidenced by the same type of submission as the other two firms. Like the Wechsler Firm, Spector Roseman & Kadroff (the "Spector Firm") have tied a descending percentage-of-recovery formula with a cap, and it works out to be somewhat more favorable to the plaintiff class than the Wechsler Firm's submission: 17% of the first $5 million, 12% of the next $10 million and 7% of the next $10 million, with the cap of $2.75 million also coming into play on any recovery in excess of $25 million. In terms of the crossover point, this litigation would have to generate a recovery of more than $36.667 million before the class would come out better financially under the Spector Firm's bid than under the Wolf Firm's proposal.

As can be seen, selection among the three bids poses a material element of uncertainty that is inherent in having to anticipate at this threshold stage of the game what the ultimate dollar outcome of the litigation is likely to be <u>if</u> plaintiffs are successful. But in this instance the prospects of net class benefit under the three bids at different levels of likely

recovery are sufficiently close that this Court is comfortable in approving presumptive lead plaintiff Moser's going to the dance with the law firm that brung him--in approving the Wolf Firm as class counsel in direct conjunction with this Court's confirmation that Moser's status as presumptive lead plaintiff is converted to a firm designation of that status.

## Conclusion

For the reasons that have been stated in this memorandum opinion and order, (1) Peter Moser is designated as the most adequate plaintiff (lead plaintiff) to represent the previously-defined class in this action and (2) Moser's own counsel, the law firm of Wolf Haldenstein Adler Freeman & Herz LLC, is approved as class counsel on the terms stated in that firm's bid for representation.[14] In further implementation of these rulings,

---

[14] In each of the other two already-cited major class actions in which this Court has employed the competitive bidding process, this Court has reserved the possibility of a fee award in excess of the cap on fees that was voluntarily specified by the successful bidder--an appropriate consideration that seeks to minimize the possibility of any undue incentive for class counsel to agree upon a less-than-optimal settlement if their services that would be required for further prosecution of the action were to outstrip what had initially been anticipated by the successful bidder. In the present instance, as indicated earlier, each of the unsuccessful law firm bidders has also included a cap on fees in its proposal, but under all the circumstances that factor has not led to either such bid being preferred by this Court over that of the Wolf Firm. Suffice it to say that if the ultimate outcome in this action were to generate a recovery in excess of the crossover points referred to earlier in the text, this Court would anticipate that its ultimate reasonableness determination would involve the same type of approach suggested in those earlier cases.

Case No. 01 C 874 is dismissed without prejudice, with the Amended Complaint in that case being treated as having been filed under this Case No. 01 C 2110, and the Amended Complaint is further amended by deleting all name plaintiffs other than Peter Moser as class representatives and by deleting the names of all plaintiffs' counsel other than the Wolf Firm as counsel for the class.

Finally, all other motions for appointment as lead plaintiff and for approval of lead counsel are denied.[15] This includes but is not limited to Dkt. Nos. 17-1 and 19-1 in Case No. 01 C 874 and Dkt. Nos. 0-1, 27-1 and 28-1 in Case No. 01 C 2110. This action is set for a next status hearing at 9 a.m. July 17, 2001.[16]

_____
Milton I. Shadur

Date:  June 25, 2001     Senior United States District Judge

---

[15]  Miller Faucher & Cafferty LLP has written to this Court confirming that it has not submitted a bid but would be pleased to serve as liaison counsel if class counsel were to request such service.  That firm was in fact selected by the Wechsler Firm to act in that capacity in the Bank One litigation.  This Court has always left to class counsel precisely what structure the successful bidder wishes to establish for anyone else's participation in the rendition of legal services under its supervision and control (of course any such arrangement would have to come within the framework of the bid amount).  This Court does so here as well.

[16]  Because of the length and comprehensiveness of the excellent submissions from each of the three highly qualified bidders, they will not be reproduced here.  Instead they are simply being placed in the court file.

01C 2109

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

01C 211

MICHAEL BLITZER, individually and ) No. 01 C 874
on behalf of all others similarly ) (also entered in Case Nos.
situated, )
) 01 C 974
) 01 C 998          JUDGE SH
          Plaintiffs, ) 01 C 999
) 01 C 1017  MAGISTRATE JUDGE ASHM
     v. ) 01 C 1060
) 01 C 1111
COMDISCO, INC., NICHOLAS K. ) 01 C 1148
PONTICKES and JOHN J. VOSICKY, ) 01 C 1177
) 01 C 1479
          Defendants. ) 01 C 1542
) 01 C 1586)

MEMORANDUM ORDER

This Court's calendar now includes the above-captioned

lowest-numbered putative securities class action in this District

Court (01 C 874) as well as two other such actions (01 C 974 and

01 C 998), each stemming from the plaintiffs' purchase of shares

of common stock in Comdisco, Inc. during the period from

January 25, 2000 through October 3, 2000. Because nine other

identical lawsuits then followed in short order--a series of

actions brought by different putative class representatives (for

the identically-identified class) against the same defendants--

this Court grants the motion heretofore filed in the Blitzer

action for reassignment of those other nine actions to this

Court's calendar on relatedness grounds under the provisions of

this District Court's LR 40.4. This early procedural order is

being entered not only in the lowest-numbered case (entitled as

reflected in the caption of this memorandum order) but also in

the other 11 higher-numbered cases (the case numbers are also
listed in the caption, and the respective plaintiffs and case
numbers are also set out in Ex. A to this memorandum order):

    1. For convenience, a separate case number and the
general caption "In re Comdisco Securities Litigation" will
be employed in all future orders and opinions in these
actions. That new case number is being stamped on the file
original of this memorandum order. In any situation in
which fewer than all of the actions are implicated in any
future order or opinion, the caption will also state
"Entered only in Case No[s]. --."

    2. Under 15 U.S.C. §78u-4(a)(3)(A),[1] the plaintiff in
Case No. 01 C 874 is obligated to have published a notice
looking to the appointment of a lead plaintiff to represent
the putative class. It is possible (though Subsection
(a)(3)(A)(ii) specifies that it is not necessary) that one
or more of the plaintiffs in the other listed cases may have
published similar notices. Counsel in each action in which
such a notice has been published are ordered to file in this
Court's chambers, on or before April 5, 2001, a statement as
to their compliance with that requirement (including as an
exhibit a copy of the notice).

---

    [1] All future references to subparts of 15 U.S.C. §78u-4
will omit that portion of the statutory designation, reading
simply "Subsection--."

3. In light of the identity of subject matter of all 12 actions involved here, this Court contemplates the sua sponte entry of an order at the next status hearing date (scheduled for 9:30 a.m. April 6, 2001) consolidating all of the actions both for pretrial purposes and for trial (see Subsection (a)(3)(B)(ii)) unless any of the parties in any case were to provide a reasonable showing as to why that action should not be taken. If the short time interval remaining between the entry of this memorandum order and that April 6 hearing date prevents any party from proffering a written statement making such a showing, this Court will of course entertain any oral submission in that respect at the time of the April 6 status hearing.

4. Because Subsection (a)(3)(B)(i) calls for this Court to determine the member or members of the putative plaintiff class who is or are "most capable of adequately representing the interests of class members" (referred to, as the statute does, as the "most adequate plaintiff"), and because there is a rebuttable and not conclusive statutory presumption that the most adequate plaintiff is a person or group having the largest financial interest in the relief sought by the class (Subsection (a)(3)(B)(iii)), this Court's view is that maximizing the recovery that will inure to the class members (whether via settlement or litigation)

is an obvious critical element in determining the adequacy of the lead plaintiff to be selected. That in turn makes the portion of any recovery to be paid to class counsel (and hence that will not be retained by the class members themselves) an important factor in the evaluation. For that reason this Court expects to consider, although it should be stressed that this Court has not yet decided either way on the matter, the possibility of inviting sealed competitive bids from counsel who seek to represent the class (see In re Bank One Shareholders Class Actions, 96 F.Supp.2d 780 (N.D. Ill. 2000) and In re Amino Acid Lysine Antitrust Litigation, 918 F.Supp. 1190 (N.D. Ill. 1996)). In light of that possibility:

(a) Until further order of this Court, counsel in the 12 different cases are ordered not to discuss between themselves any aspects of the fee arrangements on which they would respectively be prepared to act as class counsel.

(b) At or before the April 6 status hearing, each counsel in each of the 12 cases is ordered to submit a statement that no such discussion with counsel in any of the other cases has taken place before the entry of this memorandum order or, if any such prior discussion has taken place, is ordered to submit under seal a

statement describing the nature and content of such discussions.

(c)  It is recognized that certain law firms are reflected as co-counsel in more than one of the cases in this group.  In order to preserve the integrity of a bidding procedure if one were to be adopted, while at the same time avoiding conflict of interest situations for such law firms, until further order of this Court the members of those firms are ordered not to discuss the subject of any prospective fee arrangements in any of the cases in which they are acting as co-counsel.

Milton I. Shadur
Senior United States District Judge

Date:  March 26, 2001

## Exhibit A

| Case No. | Plaintiff |
|----------|-----------|
| 01 C 874 | Michael Blitzer |
| 01 C 974 | Sidney Weinstein |
| 01 C 998 | John Hinsley |
| 01 C 999 | I & M Associates, Inc. |
| 01 C 1017 | Gail Fialkov |
| 01 C 1060 | Andrew Kandel |
| 01 C 1111 | Joseph Falzone |
| 01 C 1148 | Christopher Manolakes |
| 01 C 1177 | Michael Ceasar as Trustee |
| 01 C 1479 | Robert Waring |
| 01 C 1542 | Michael Mattie |
| 01 C 1586 | John Kuzia |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In re                                    )
                                         )   No. 01 C 2110
    COMDISCO SECURITIES LITIGATION )
_____)
                                         )
MICHAEL BLITZER, etc., et al.,           )
                                         )
                    Plaintiffs,          )
                                         )
    v.                                   )   No.  01 C 874
                                         )
COMDISCO, INC., et al.,                  )
                                         )
                    Defendants.          )

### MEMORANDUM ORDER

In further implementation of this Court's March 26, 2001
memorandum order ("March 26 Order"), and in conjunction with this
Court's anticipated determination of the "most adequate
plaintiff" (see 15 U.S.C. §78u-4(a)(3)(B)[1]) to represent the
putative plaintiff class in these actions, all attorneys of
record in these actions, and any other attorneys who have timely
filed motions under Subsection (a)(3)(B) for any member of the
putative class to serve as lead plaintiff, are authorized to file
in this Court's chambers, on or before May 4, 2001, sealed bids
as to the fee arrangements under which they will be prepared to
represent the plaintiff class in all actions other than Case No.
01 C 1177 if they are hereafter appointed to serve as class

_____

[1]     Each future reference to any subpart of 15 U.S.C. §78u-4
will omit that portion of the statutory designation, reading
simply "Subsection--."

counsel or as co-class counsel in this entire class action litigation except for Case No. 01 C 1177 (if co-class counsel were to be appointed, each such bid must represent the total fees that would be contemplated to be paid to all co-counsel including the bidder).[2]  Each such bid shall be accompanied by a comprehensive curriculum vitae regarding the bidding lawyers or law firm or firms, including appropriate information as to their prior class action experience.

Although this memorandum order has thus established a bidding procedure, it should be understood that this Court has not reached a firm conclusion as to whether the class counsel will be selected on the basis of such bidding.  Accordingly, as was provided in this Court's In re Amino Acid Lysine Antitrust Litigation opinion (reported at 918 F.Supp. 1190, 1192 (N.D. Ill. 1996)), any bidder or any interested party not submitting a bid may include or make a written submission on or before May 4, 2001 as to the asserted desirability or undesirability of employing the bidding procedure rather than some other approach to the appointment and compensation of class counsel.  In that regard this Court is well aware of, and will take into account, the In

---

[2]  In part the procedure established here is intended to anticipate the possibility that the lowest responsible bidder among the lawyers or law firms electing to bid may prove to be other than the lawyers or law firm or firms who or that already represent the person or group of persons that would otherwise appear to qualify as the "most adequate plaintiff" within the meaning of Subsection (a)(3)(B)).

re Cendant Corp. PRIDES Litig., No. 99-5555, 2001 WL 276677 opinion issued on March 21, 2001 by the Court of Appeals for the Third Circuit (the same court that now has a Task Force study under way to address that subject). In all other respects the bidding procedure will follow the principles set forth in the Lysine opinion and in the March 26 Order.[3]

As it has done in the Bank One Securities Litigation, this Court contemplates the possible utilization of the bidding procedure as an adjunct to its determination of the "most adequate plaintiff." That latter determination will be made as soon as is practicable, whether or not the legal representation of the plaintiff class is awarded on the basis of bids. If the award is not made on that basis, each bid will be returned to the bidder or bidders involved without disclosure to the other bidders or to the clients represented by such bidders.

Milton I. Shadur
Senior United States District Judge

Date: April 6, 2001

---

[3] As was true in this Court's handling of the In re Bank One Securities Litigation, 00 C 880, this Court will not entertain any proposal by a prospective class plaintiff for a right to match the most favorable attorneys' fee bid if this Court elects to employ a bidding procedure.

3